Filed 10/21/15  P. v. Buckley CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D066227 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD244590) |
| THOMAS CONATY BUCKLEY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Louis R. Hanoian, Judge.  Modified in part, affirmed in part, remanded with directions.

Patrick Morgan Ford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Julie L. Garland, Assistant Attorneys General, A. Natasha Cortina, Michael Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Thomas Conaty Buckley of simple stalking of M.L. (Pen. Code,[1] § 646.9, subd. (a); count 1) and of stalking M.L. with a court order in effect (§ 646.9, subd. (b); counts 2-3). It also convicted Buckley of one count of simple stalking of K.C. (§ 646.9, subd. (a); count 6) but found him not guilty of another count of simple stalking of K.C. (§ 646.9, subd. (b); count 4) and of stalking K.C. with a court order in effect (§ 646.9, subd. (b); count 5).

In separate proceedings, Buckley admitted he had suffered three prior prison convictions as charged in the amended information. The court sentenced Buckley to 19 years in state prison as follows: it designated count 1 as the upper term and imposed a 10-year term on it, plus consecutive two-year terms on counts 2, 3, and 6, and consecutive one-year terms for each of his three prior prison convictions under the "Three Strikes Law."

Buckley contends the trial court erroneously (1) permitted the prosecution to amend the information on the first day of trial and denied him a continuance to address this amended information, thus violating his constitutional rights to due process and a fair trial; (2) denied his motion to sever his trial for the crimes committed against the two victims, thus violating his constitutional right to testify; (3) permitted prejudicial misconduct by the prosecutor's victim-witness advocate to deprive him of a fair trial; and (4) sentenced him under both section 646.9 subdivision (a) and section 646.9 subdivision (b) for his convictions involving M.L., despite the fact that the latter provision relates to a

---

[1]     Statutory references are to the Penal Code.

penalty and not a substantive crime.  We vacate the conviction on counts 1 and 2 and otherwise affirm the judgment.  We remand for resentencing.

BACKGROUND

We do not set forth the facts in detail because Buckley does not challenge his convictions on sufficiency of the evidence grounds.

*Count 1—Stalking of M.L.* (*November 12, 2010, to November 15, 2010*)

M.L. met Buckley in June 2010, and they started an intimate relationship.  The morning of November 12, 2010, she ended the relationship.  Buckley did not agree to the breakup.  During the ensuing approximately 30 hours, he telephoned her about 30 times and sent her about 70 text messages.  Buckley sent M.L. via text message a photograph of a dead person in a pool of blood.  M.L. was afraid because Buckley knew that her father had committed suicide.  Buckley sent M.L. a text message accusing her of killing her father.  Buckley also sent M.L. a suicide note that made her fear for her personal safety.  M.L testified, "I don't know if he's referencing my dad or if he is referencing himself or he means I'm going to die."  When M.L. was packing her belongings to leave Buckley's apartment, he was very upset and broke her belongings and punched holes in a closet while telling her, "I love you."  Buckley grabbed a knife, went to the bathroom and threatened to kill himself.  M.L. called police and Buckley's probation officer.

On November 15, 2010, M.L. obtained a temporary restraining order (TRO) against Buckley.

3

*Count 2—Stalking of M.L. With a Court Order in Effect*

*(November 16, 2010, to November 30, 2010)*

After M.L. had obtained a TRO, Buckley continued to telephone her.  He also sent M.L.'s mother text messages, including one with an attached nude picture of M.L.  M.L. was afraid Buckley would send her nude pictures to her boss or coworkers, thus endangering her employment.

*Count 3—Stalking of M.L. With a Court Order in Effect*

*(December 1, 2010, to September 30, 2012)*

On December 1, 2010, the court issued a 5-year permanent restraining order barring Buckley from contacting M.L.  At the hearing regarding that restraining order, Buckley handed M.L. her mail, specifically a catalog, inside of which he had placed nude pictures of her.  She became afraid because he did not seem to care about the court's order.  At one point, the bailiff escorted Buckley away.  But a short time afterwards, when M.L. was filling out paper work, Buckley returned, walked past her and stared at her "like he wanted to kill [her]."  That same day police arrested Buckley for violating the terms of his parole.  His parole was revoked, and he was imprisoned.

Even after Buckley's arrest he continued to telephone M.L. about 70 or 80 times.  She reported his actions to police in February 2011.  Buckley also asked other individuals to contact M.L. on his behalf, making M.L. fear he would hurt her or harm her employment.  M.L. stated that following a jailhouse call she received from Buckley in May 2011, she checked Buckley's record of convictions:  "I was so fearful I said 'who— what am I dealing with?' "  She checked a court website and discovered "[t]hat

4

[Buckley's] done everything under the sun illegally, everything; I mean rape, burglary, [driving under the influence], evading an officer, assault, the list was long. I said, 'there is no way. He's scary. And I just need to put myself as far away from him as possible.' But how? I mean I've filed all these police reports, and nothing is happening from it. So I was frustrated."

On September 30, 2012, Buckley sent M.L. a text message stating he was changing residences and moving to a place on the same street as M.L., and asking her if that would be a problem. M.L. testified, "There is no way he would have known [my new address]. I don't know how he knew." M.L. was afraid and contacted police. She testified that at the time of trial she still feared Buckley and was receiving counseling. She explained she became discouraged because she had to contact police multiple times: "I would always think, you know, the hoops you have to go through and the memories that you have to relive and it's all out there for everyone to see. It was really a hard process so that's why I went into therapy so that I could, you know, compose myself during this process."

*Count 6—Stalking of K.C. with Court Order in Effect*

(*October 27, 2012, to November 12, 2012*)

K.C. and Buckley had a three-week intimate relationship lasting from around September 2, 2012, to September 24, 2012, during which she allowed him to take nude photos of her. When K.C. broke off the relationship, Buckley got upset and sent her numerous text messages. In early October 2012, K.C. obtained a TRO against Buckley,

5

but he continued contacting her by phone and text message. On October 25, 2012, she got a permanent restraining order against him.

In October 2012, K.C. investigated Buckley's criminal history and learned he had been convicted of stalking and rape, and this increased her fear of him. K.C. learned about M.L.'s TRO against Buckley.

The night of November 9, 2012, when one of K.C.'s friends came to visit her, K.C.'s dog escaped from the yard (just as it had a previous night when police had later found Buckley near her house). When K.C.'s friend was about to leave, he saw Buckley outside the house, and decided to spend the night at K.C.'s house. The next morning, K.C. discovered that her guest's car had been keyed. K.C. sent Buckley a text message asking if he knew her dogs' whereabouts. He replied, "[The dog] is missing? Karma?" He also texted her saying he had found the dog, and asking K.C. to call him as soon as possible.

In November 2012, Buckley sent K.C.'s nude photos to some of her friends and also posted those pictures on a Facebook page he had created. One night when she and a roommate were watching television, Buckley sent her a text message on her work cell phone stating he was aware they were watching television. K.C. was afraid and changed her personal contact information and removed information about herself from the Internet. She also invested in a security system for her house.

*San Diego Police Department Detective Roger McCarvel's Testimony*

San Diego Police Detective Roger McCarvel spoke with M.L. on November 29, 2010, about Buckley's harassing conduct and again on December 1, 2010, after M.L. had obtained a temporary restraining order. He described her demeanor as upset, adding that M.L just wanted Buckley to stop contacting her.

DISCUSSION

I.

*The Court Did Not Err by Permitting the Prosecution to Amend the Information*

Buckley contends the trial court erred by permitting the prosecution to amend the information on the first day of trial to add new charges, thus denying him due process and a fair trial. He argues: "The specific prejudice incurred by [him] was having to try and substantially change the defense and scramble to find witnesses and evidence to challenge the new charges and more specific time periods. The problem was exacerbated by the court's denial of a continuance in order to have adequate time to prepare an 'amended defense.' "

A. *Background*

In December 2012, the People filed an information alleging that between November 10, 2010, and September 30, 2011, Buckley stalked M.L. with a court order in effect (§ 646.9, subd. (b); count 1); stalked K.C. between September 30, 2012, and November 11, 2012, (§ 646.9, subd. (a); count 2) and between October 25, 2012, and November 11, 2012, stalked K.C. with a court order in effect (§ 646.9, subd. (b); count 3).

7

On September 19, 2013, at the start of trial, the People moved to amend the information to allege a total of six counts specifying discrete time frames in which Buckley stalked M.L and K.C.[2] Defense counsel objected: "Today's the date of trial. . . . I believe at this late in the case, that it may extend [Buckley's] exposure although with the dates and [section] 654, I'm not sure."

The court granted the People's motion to amend: "In this particular case, [the amended information] didn't really allege any new conduct. Any conduct that wasn't [referenced at the preliminary hearing], it wasn't anything that would prejudice the defense's opportunity to present a defense to any of the charges. [¶] And as such there has been notice of the fact of the events that are the subject of the amended information and . . . there has been notice and there has been an opportunity to present a defense for these charges as they are currently charged in the amended information."

On September 23, 2013, the People filed a first amended information, which did not further change the stalking allegations; rather, it only modified the details regarding Buckley's prior convictions. Defense counsel objected that she needed time to secure the

[2] The amended information alleged Buckley stalked M.L. between November 12, 2010, and November 15, 2010 (§ 646.9, subd. (a); count 1); stalked M.L. between November 16, 2010, and November 30, 2010, while a court order was in effect (§ 646.9, subd. (b); count 2); and stalked M.L. between December 1, 2010, and September 30, 2012, while a court order was in effect (§ 646.9, subd. (b); count 3). It also alleged Buckley stalked K.C. between September 30, 2012, and October 5, 2012, while a court order was in effect (§ 646.9, subd. (a); count 4); stalked K.C. between October 6, 2012, and October 26, 2012, while a court order was in effect (§ 646.9, subd. (b); count 5); and stalked K.C. between October 27, 2012, and November 12, 2012 (§ 646.9, subd. (a); count 6).

testimony of San Diego Police Officer Fay, who "took a report early on before the restraining order was filed."

The court overruled Buckley's objection: "I don't see where the real posture of the case has really changed. The defense has always been on notice that the conduct . . . in question started in November of 2010 and really led all the way up to . . . [November 2012] between the two alleged victims in the case. And I don't see by parsing it out as to whether or not there is sufficient intent." Accordingly, the court again granted the People's motion to amend: "[T]he defense is the same [as] to each one of the charges as they are . . . currently charged. The only difference that has been added is that . . . the prosecution has parceled out those actions that took place after the issuance of a restraining order and then after the issuance of an injunction. . . . There is no new discovery associated with those particular charges as modified."[3]

B. *Legal Principles*

Section 1009 states: "An indictment or accusation cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." If leave is granted to amend an information, the decision is overturned only if it amounts to an abuse of the trial court's considerable discretion. (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 458.) The pre-

---

[3]    In a new trial motion, defense counsel conceded: "[T]he changes themselves [to the first amended information] didn't add any sort of—didn't allege any new violation or didn't allege any new conduct, but I think the issue is with the second element: whether or not the change required additional preparation by trial counsel, and I think trial counsel did make a fairly clear record in that she wanted to subpoena [Officer Fay]."

eminent due process principle is that the accused must be informed of the nature and cause of the accusation. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15; *People v. Torres* (2011) 198 Cal.App.4th 1131, 1139-1140.) A defendant's due process rights are not prejudiced by amendment of the information, and the trial court may permit amendment of the accusatory pleading "at any stage of the proceeding, up to and including the close of trial," so long as the defendant's substantial rights are not prejudiced. (*People v. Graff* (2009) 170 Cal.App.4th 345, 361.)

C. *Analysis*

We conclude the trial court did not abuse its discretion by permitting the prosecution to amend the information. As defense counsel conceded, the amendment did not add any charge that was not supported by evidence adduced at the preliminary hearing; therefore, Buckley's substantial rights were not prejudiced. From the time Buckley knew of the original complaint, he was on notice of allegations regarding stalking, some of which were alleged to have occurred after a court order was in place. Finally, as noted, the trial court has broad discretion to permit amendments even during trial. The court stated that even after it had granted the first motion to amend, the defense had a few days to adjust to the ruling and respond accordingly. On this record, there was no error.

## II.

*The Court Did Not Err by Denying Buckley's Motion for a Continuance*

Buckley contends the court erred by not granting him a continuance, thus depriving him of an opportunity to obtain Officer Fay's trial testimony, "which would

10

have substantially impeached [M.L.'s] claims.  The amendment required counsel to change her strategy from defending three charges during a broad period of time to six charges allegedly occurring during more specific time periods.  This required additional evidence and time to prepare."

A. *Background*

After the court permitted the prosecution to amend the information the first time, defense counsel sought the court's commitment to help her address trial preparations in light of the amendments:  "I'm going to continue to obviously investigate and try to get these witnesses in that [*sic*] I feel are necessary and I would appreciate some leniency if necessary with scheduling conflicts if I get those last minute witnesses on board."  The court agreed:  "You will of course have those things."  At that hearing, the prosecutor informed the court:  "For the record too, and I explained to [defense counsel,] I believe I have Officer Fay subpoenaed.  I was not intending on calling him.  I think he's either out the first two days of this week.  I can check into that for [defense counsel], but I will make him available for [defense counsel] under my subpoena as well."

During trial, defense counsel sought a continuance to obtain Officer Fay's testimony:  "The more I listen to M.L.'s testimony about her attitude and her frustration with the system and filing multiple police reports, I think it is imperative for me to get Officer Fay's testimony, live testimony here about [M.L.'s] demeanor when she made that report.  She said she did not desire prosecution.  She never mentioned any threats whatsoever, but she was afraid for Mr. Buckley's safety and wanted, you know, officers to be contacting him for the possible suicide issue."

To address defense counsel's concern, the prosecutor offered to stipulate as to what M.L. had told Officer Fay. But the prosecutor opposed the continuance: "In a stalking crime, it is not just the time frame of the stalking we're talking about. It is everything that happened before that. So [defense counsel] has been on notice that the defendant's demeanor, regardless of whether the time frame is extended or been broken down into different areas, has always been a matter in this case. [Defense counsel has] always had the opportunity to know that her client's demeanor is at issue and the victim's demeanor is at issue at all times." The court denied the continuance request.[4]

B. *Legal Principles*

" 'A motion for continuance should be granted only on a showing of good cause. (§ 1050, subd. (e).)' [Citation.] To support a continuance motion to secure a witness's attendance at trial, a showing of good cause requires a demonstration, among other things, that the defendant exercised due diligence to secure the witness's attendance." (*People v. Wilson* (2005) 36 Cal.4th 309, 352.) " '[T]he decision whether or not to grant a

---

[4]     At the hearing on the new trial motion, the court explained why it had denied the requested continuance: "But the fact of the matter is [defense counsel] wanted to subpoena somebody that was under subpoena. So why would I grant a continuance under those circumstances so that [defense counsel] could subpoena a witness that was already under subpoena?" The court added: "The addition of the charges stated in a different way did not involve any new discovery, any new witnesses, did not change the nature of the charges. It just had added a couple of charges there. [¶] . . . There had been multiple continuances of this trial, starting with [February 15, 2013,] up until [September 17, 2013]. The amended information was filed on [September 19, 2013]. Jury selection didn't begin for four days. [¶] Counsel had plenty of time to consult with . . . [Buckley], to revaluate a strategy, and if a witness was not subpoenaed, which [he] was, counsel could have effected that subpoena in the four days between [September, 19, 2013, and September 23, 2013]."

continuance of a matter rests within the sound discretion of the trial court. [Citations.] The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.] [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. [Citations.] Moreover, the denial of a continuance may be so arbitrary as to deny due process. [Citation.] However, not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence. [Citation.]' [Citation.] '[T]he trial court may not exercise its discretion "so as to deprive the defendant or his attorney of a reasonable opportunity to prepare." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 650.)

C. *Analysis*

We conclude the court did not abuse its discretion in declining to grant Buckley a continuance. M.L.'s demeanor when she reported the stalking incidents to police did not suddenly become important after the information was amended. Rather, it was always at issue in the case, even under the original information. As a result, Buckley has not shown he exercised diligence in obtaining testimony on this issue. In any event, Buckley overstates the importance of M.L.'s demeanor as recorded by Officer Fay, whose description of M.L.'s demeanor was not dispositive of whether during the time the stalking persisted M.L. was reasonably in fear for her life because of Buckley's malicious

harassing conduct under section 646.9, subdivision (a).[5]  Further, the People had already subpoenaed Officer Fay and were willing to make him available to the defense.  The People also were prepared to stipulate regarding what M.L. told Officer Fay, thus facilitating matters for the defense.  Moreover, Officer McCarvel testified regarding M.L.'s demeanor when she reported an incident of Buckley's continued harassment of her after she had obtained the TRO.  This testimony was helpful in lieu of Officer Fay's testimony.  In light of these circumstances, we conclude the court did not abuse its wide discretion in denying the continuance.

Nor "did the court's ruling deny defendant his federal constitutional rights to due process and compulsory process."  (*People v. Howard* (1992) 1 Cal.4th 1132, 1171.)  "In this case, defendant could not show that he had been diligent in securing an expert witness's attendance, that a substitute would be available within a reasonable time, or that any witness, assuming one could be found, would say something material and helpful to the defense.  Under these circumstances, '[g]iven the deference necessarily due a state trial judge in regard to the denial or granting of continuances,' the court's ruling does not support a claim of error under the federal Constitution."  (*Id.* at p. 1172; see also *People v. Wilson*, *supra*, 36 Cal.4th at p. 352.)

---

5    The prosecutor asked Officer McCarvel:  "When you were deciding what to do with the first report, did you take into account [M.L.'s] demeanor and attitude about the alleged violations?"  Officer McCarvel responded, "Well she could have a really upset demeanor but if there is no evidence, it's not going to get prosecuted.  So she could be upset, she could be happy, she can be anything but if there is no evidence it is not going to go anywhere."

14

III.

*The Court Did Not Err by Denying Buckley's Motion for Severance*

Buckley contends that by denying his severance motion, the trial court erroneously prevented him from testifying in a separate trial on the allegations regarding M.L., where he would have had an opportunity to refute her claims that she was afraid of him "due to his past acts." He argues that in light of the court's decision to join the cases, "[e]ven had [he] taken the stand 'conditionally,' i.e., limiting his testimony to the [M.L.] issue, the jury would have been left to wonder about [K.C.'s] claimed fear. It would have reasonably questioned why [K.C.] was not addressed and whether [Buckley's] intent as to [M.L.] differed from his intent regarding [K.C.]"

A. *Background*

The court declined Buckley's request to sever the charges and conduct two trials, ruling that the same crime of stalking was involved in the charged offenses against M.L. and K.C.; the evidence was cross-admissible; and the two victims' cases against Buckley appeared to be of equal strength.

B. *Legal Principles*

"Section 954 provides that '[a]n accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated.' Even where the statutory requirements for joinder are satisfied,

15

however, 'a trial court has discretion to order that properly joined charges be tried separately.' " (*People v. Scott* (2015) 61 Cal.4th 363, 395.)

" 'The law favors the joinder of counts because such a course of action promotes efficiency.' " (*People v. Scott*, *supra*, 61 Cal.4th at p. 395; *People v. Trujeque* (2015) 61 Cal.4th 227, 259.) " 'A unitary trial requires a single courtroom, judge, and court attach[és]. Only one group of jurors need serve, and the expenditure of time for jury voir dire and trial is greatly reduced over that required were the cases separately tried. In addition, the public is served by the reduced delay on disposition of criminal charges both in trial and through the appellate process.' " (*People v. Soper* (2009) 45 Cal.4th 759, 772.) "For these and related reasons, consolidation or joinder of charged offenses 'is the course of action preferred by the law.' " (*Ibid.*)

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; *People v. Lucky* (1988) 45 Cal.3d 259, 276.) Consolidation or joinder is generally preferred by the law because it promotes efficiency. (*People v. Hartsch* (2010) 49 Cal.4th 472, 493.)

Nevertheless, " '[r]efusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials;

16

(2) certain of the charges are unusually likely to inflame the jury against the defendant; [or] (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges . . . .' " (*People v. Scott*, *supra*, 61 Cal.4th at p. 396.) "If the evidence underlying the joined charges would have been cross-admissible at hypothetical separate trials, 'that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' " (*People v. Merriman* (2014) 60 Cal.4th 1, 38.)

"In determining whether denial of the severance motion was an abuse of discretion, we examine the record before the trial court at the time of its ruling." (*People v. Scott*, *supra*, 61 Cal.4th at p. 396.) To establish an abuse of discretion in this context, Buckley "must make a clear showing of prejudice . . . ." (*Ibid*.) We first decide whether the statutory requirements for joinder are met, and then assess whether the trial court properly determined that joinder would not prejudice Buckley. (*People v. Scott*, *supra*, 61 Cal.4th at p. 395; *People v. Lucky, supra,* 45 Cal.3d at pp. 276-277.)

C. *Analysis*

The trial court did not err by finding the statutory requirements for joinder were met. The evidence was cross-admissible; specifically, both M.L. and K.C. testified that they investigated Buckley's criminal past, and the information they found regarding Buckley's crimes influenced their decision to take Buckley's threats more seriously.

Buckley's conduct with both victims was similar: his relationships started out intensely but were short-lived because the women terminated them. At that point,

17

Buckley refused to accept the breakups, and he elected to send a large amount of text messages and make phone calls to harass the victims. Having quickly obtained the victim's nude photos at the start of the relationship, he threatened to send their nude photos to employers or friends and actually carried out the threat. His harassing conduct with both victims continued despite court orders banning him from contacting them.

When Buckley argued in the trial court that a denial of his motion for severance would violate his right to testify, the court pointed out that his not being willing to testify was not a bar to severance under the United States Supreme Court precedent. The court correctly repeated that notion. "The criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. [Citation.] Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose. The threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved." (*McGautha v. California* (1971) 402 U.S. 183, 213.) Here, the choice Buckley faced was between testifying about M.L. and not testifying about K.C., with the attendant risk that the jury would question that decision and cast doubt on the charges regarding K.C., or not testifying at all. But Buckley has not shown that the choice he faced impaired his right to testify to any appreciable extent. We have no basis for concluding he suffered a violation of his constitutional rights by the court's denial of his motion for severance.

18

IV.

*Claim of Prejudicial Misconduct*

Buckley contends a victim-witness advocate who assisted M.L. at trial committed misconduct that deprived him of a fair trial. Specifically, he contends the victim-witness advocate "comment[ed] to [M.L.], within earshot of the jury, that [M.L.] was 'doing a good job' in testifying for the prosecution. [Citation.] This is precisely the type of vouching by insinuation that has long been condemned by the courts." He adds: "This vouching by insinuation from a member of the prosecution's office carried with it an enormous potential to improperly influence the jury. And [the victim-witness advocate's] question to [M.L.] whether she was in counseling goes to the central issue in [M.L.'s] case, i.e., whether she developed a fear of [Buckley] and whether that fear was 'reasonable.' "

A. *Background*

One day during trial, defense counsel alerted the court that during a sidebar conference, the victim-witness advocate was seen talking to M.L. within view of the jurors. The court asked the victim-witness advocate about the matter, and she replied, "I was just supporting [M.L.], just telling her she's doing a good job, asked her if she was in counseling. Just very benign conversation. Talked nothing about the case." The court told the victim-witness advocate it had a problem with that conduct, and directed her to cease it.

Defense counsel moved for a mistrial based on the victim-witness advocate's conduct, but the court denied the motion. The court instead gave the jury this curative

19

instruction that both counsel approved: "When the attorneys and I were outside the courtroom during a sidebar conference yesterday afternoon, the person who was employed by the district attorney's office as a victim-witness advocate was allowed to approach [M.L.] while she was on the witness stand, in order to provide her with some comfort and support—or comfort and encouragement. That should not have happened. While the D.A. advocate's job includes providing comfort and encouragement to witnesses, that function should not occur in the presence of the jury. [¶] You are to decide this case based on your assessment of the testimony of all the witnesses, and all of the evidence presented[,] not on the basis of any passion or prejudice you may have formed. I know that it is difficult to forget something that occurs in your presence, but for the sake of the defendant's right to a fair trial, I'm requesting that you disregard—you disregard that conduct. You regard it simply as improper, put it aside while you're deliberating. You are to disregard anything in its entirety that was said by either the advocate or the witness while court was not in session. It is not evidence and you may not consider it for any purpose. [¶] Now if anyone cannot follow my request then I need to be alerted to that fact[,] and you can write it on a note and give it to the bailiff." The court later reported that no juror ever notified it of any problem in following the curative instruction.

B. *Analysis*

Section 868.5 entitles the victim of certain crimes to the presence of a support person to accompany him or her to the witness stand. "The court has the duty to use its good judgment to curtail any unnecessary actions by the support person which might

20

sway or influence the victim-witness or jury." (*People v. Patten* (1992) 9 Cal.App.4th 1718, 1732; accord, *People v. Myles* (2012) 53 Cal.4th 1181, 1214.) Here, in the exercise of its discretion, as soon as the court became aware of the victim-witness advocate's offending conduct, it instructed the jury with a comprehensive curative instruction that reminded the jury to focus on the trial evidence and disregard extraneous matters. The instruction also told the jurors to alert the court if they could not comply with the instruction. It is generally assumed that a curative instruction is effective unless the misconduct resulted in a miscarriage of justice. (*People v. Lucero* (1988) 44 Cal.3d 1006, 1023.) Here, the court received no indication that any juror failed to comply with the instruction. Jurors are presumed to understand, accept, and faithfully follow instructions. (See *People v. Homick* (2012) 55 Cal.4th 816, 866-867.) We conclude that any prejudice from the witness-advocate's conduct was dispelled by the curative instruction.

V.

*The Court Erred by Sentencing Buckley on Counts 1, 2 and 3*

Relying on *People v. Muhammad* (2007) 157 Cal.App.4th 484 (*Muhammad*) Buckley contends: "The amended information improperly charged [him] with violating . . . section 646.9, subdivision (b), which is a penalty provision, not a substantive crime, and the resulting convictions were therefore improper." Buckley argues the only

21

convictions that can stand are those for simple stalking alleged in counts one and six.[6]  In his reply brief, Buckley claims:  "[T]he prosecution's decision to divide the charges into smaller time frames in a long series of events does not change the fact that the charges involved a continuous course of conduct as there was no event that interrupted that series of acts."

A. *Background*

In sentencing Buckley consecutively, the court reasoned:  "While the offenses that occasioned the—restraining order in the first instance and the offenses which support the conviction for count 1 are exceptionally aggravated, . . . notwithstanding the fact that Mr. Buckley was informed by the court by the service of court process that he was not to continue to contact [M.L.] and that she wanted nothing to do with him, the violations of the restraining order [under section 646.9, subdivision (b)], both after the temporary and after the permanent restraining order, places this in a whole different level of aggravation. [¶]  Maybe you didn't get it before, but how can you not get it after someone goes to court, gets the process, serves you with that process, and in no uncertain terms does not want contact?  [¶]  And that's what aggravates this case.  . . .  [T]he fact that they are separate times and . . . separate distinct events makes this a consecutively-sentenced case."

The court rejected the applicability of *Muhammad, supra,* 157 Cal.App.4th 484: "[That case] was one series of events that was charged in three different ways.  Here, we

_____

6        Buckley does not challenge his conviction for his stalking of K.C. (count 6); therefore, we do not address that portion of the sentence imposed.

22

have three different charges coming out of a time span, each is a distinctive [time] span for the charge, and the establishment of the offense was . . . provided separately and apart."

B. *Legal Principles*

The offense of stalking is defined in section 646.9, subdivisions (a) through (d), with each subdivision providing for a different punishment depending on the attendant circumstances. The statute defines, and prescribes particular punishments, for simple stalking (§ 646.9, subd. (a)); stalking in violation of a court order (§ 646.9, subd. (b)); and stalking after having been convicted of specified felonies (§ 646.9, subd. (c)). The elements of stalking are repeatedly following or harassing another person, and making a credible threat with the intent to place that person in fear. (§ 646.9, subd. (a)); *Muhammad, supra*, 157 Cal.App.4th at p. 493, fn. 8.) Simple stalking is a lesser included offense of stalking in violation of a court order because the latter offense necessarily constitutes a commission of the former offense. (*Id.* at p. 490, fn. 6.) Further, the stalking statute has been construed as defining a single offense, albeit with different associated penalties under each subdivision. (*Id*. at pp. 490-492.)

"[I]t is true that section 646.9, subdivisions (a) and (b) are to be read together. However, it is not the language of subdivision (a) and the language of the restraining order which must be harmonized; it is that defendant's *behavior* must have violated both subdivision (a) and the order. If the defendant's conduct constitutes repeated following or harassment [citation] and defendant has made a credible threat, then defendant has violated subdivision (a). If the same conduct is also prohibited by an existing restraining

23

order against the defendant, then the defendant has violated subdivision (b). Thus, subdivision (b) serves the manifest legislative purpose of providing enhanced punishment to those stalkers who have been ordered to refrain from such conduct in civil proceedings, and, hence, have been warned that their behavior is unacceptable." (*People v. McClelland* (1996) 42 Cal.App.4th 144, 152.)

Also, stalking is viewed as a continuing offense because it requires repeated following or a course of harassing conduct. (§ 646.9, subds. (a), (e), (f) [stalking crime committed by "person who willfully, maliciously, and repeatedly follows or willfully and maliciously harasses another person"; " 'harasses' means engages in a knowing and willful course of conduct"; " 'course of conduct' means two or more acts occurring over a period of time, however short, evidencing a continuity of purpose"]; *People v. Chilelli* (2014) 225 Cal.App.4th 581, 586.)

C. *Analysis*

Here, the record establishes but one continuous criminal act of stalking that Buckley committed against M.L., starting in November 2010 and ending in September 2012. Nevertheless, the prosecution divided this time period into three different counts, thus subjecting Buckley to multiple convictions for the single offense of stalking. As alleged in the amended complaint, the stalking of M.L. in each count was immediately followed by the stalking of her in the successive counts, with no significant break in time to indicate that one continuous course of stalking had ended and a new one had begun. "A continuous course of conduct crime is not completed by a discrete act; the continuous course of conduct is complete when the last criminal act is performed." (*People v.*

24

*Chilleli, supra,* 225 Cal.App.4th at p. 585; accord, *People v. Lewis* (1978) 77 Cal.App.3d 455, 459-461 [only one conviction of pimping based on ongoing conduct with the same prostitute during a five-year period].) We conclude Buckley could properly be convicted of only one charge of stalking of M.L.

Here, the People argue the separate stalking convictions "made sense because each of the three counts represented qualitatively different courses of conduct." But as the court stated in *People v. Lewis, supra,* 77 Cal.App.3d at p. 462, "It is no answer to suggest, as does the Attorney General, that defendant's extensive culpability justified multiple counts and multiple convictions," adding, "[h]owever, the seriousness of the crime and defendant's culpability can be and should be appropriately dealt with by the trial court at the time of sentence."

DISPOSITION

We vacate the conviction and sentence on count 1 (Pen. Code, § 646.9, subd. (a)) and count 2 (Pen. Code, § 646.9, subd. (b)).  In all other respects the judgment is affirmed.  The matter is remanded to the Superior Court to resentence Thomas Conaty Buckley accordingly and prepare an amended abstract of judgment and forward a certified copy of it to the Department of Corrections and Rehabilitation.


O'ROURKE, J.

WE CONCUR:


McINTYRE, Acting P. J.


IRION, J.

26